IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATALIA KURILOVA, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Case No. 3:25-cv-00930-N |
| | § | |
| NATURICH COSMETIC LABS, INC. | § | |
| d/b/a NATURICH LABS, INC., | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

COMES NOW, Natalia Kurilova ("Plaintiff" or "Kurilova"), and files this First Amended Complaint and Jury Demand and would respectfully show the following:

### I. PARTIES

1. Kurilova is citizen of the United States and a resident of Dallas, Dallas county, Texas.

2. Defendant, Naturich Cosmetic Labs, Inc., d/b/a Naturich Labs, Inc. ("Defendant" or "Naturich") is a Texas corporation. Naturich may be served by service on its registered agent: Prakash Purohit, 2505 Merritt Drive, Garland, Texas 75041.

### II. JURISDICTION

3. Jurisdiction of this Court is based on the Consumer Product Safety Improvement Act ("CPSIA"), 15 U.S.C. § 2087 *et seq* and the Food Safety Modernization Act ("FSMA") 21 U.S.C. § 399d *et seq*.

4. Kurilova originally filed this matter with OSHA, Department of Labor, Dallas, Texas, on or about August 20, 2024. The complaint is currently pending investigation, OSHA Case No. 301040863. This matter has been pending more than 210 days with the Secretary of Labor and the delay is not due to bad faith of Kurilova, and she therefore brings this action for de novo review.

Plaintiff's First Amended Complaint and Jury Demand –

### III. VENUE

5.      Venue is proper in this division because all or a substantial portion of these matters occurred at Defendant's corporate headquarters in Garland, Dallas County, Texas.

### IV.  FACTS

6.      Naturich hired Kurilova on February 6, 2023, to serve as its Director of Account Management, reporting directly to Naturich's Founder and President Prakash Purohit ("Purohit"). This was an executive level position, and Kurilova served as one of six members of Naturich's Board of Directors. Kurilova was responsible for hiring and supervising the team tasked with handling Naturich's numerous clients. Kurilova received positive feedback and was recognized for her skills and relationships with Naturich's clients and was well liked.

7.      Kurilova brought Naturich more than twenty years of consumer product operations and distribution experience on the sales side.  Specifically, Kurilova worked for Coral Club International, a dietary supplement producer and distributor, for seven years.  Kurilova has extensive experience as an operational and sales executive in working with dietary supplements, medical devices and health and beauty products.

8.      Naturich's cosmetic and body care products are widely distributed to numerous global retailers and luxury hotels.

9.      On October 27, 2023, Kurilova reported brown particles in eye makeup remover manufactured by Naturich for Whole Foods.  Kurilova reported the contamination to Plant Manager Mark Itzstein ("Itzstein") and Controller Amer Ammari ("Ammari").  The particles turned out to be burned product residue (charcoal) from Naturich's tank walls.  The entire production run/finished goods were rejected.  Naturich reworked the product by dumping liquid back in a tank to

Plaintiff's First Amended Complaint and Jury Demand –

refilter the contaminated product and rebottle the product in order to place the product in the Whole Foods inventory for future orders.

10.    On November 1, 2023, Kurilova received a client complaint of visible contaminated bacteria growth in four scents of body cream Naturich manufactured for Malie Organics.  Kurilova reported the contamination to multiple members of management, including Purohit, Itzstein and Ammari.  Purohit stated at an executive meeting discussing the contamination that the type of bacteria found in the body cream could cause blindness.

11.    Naturich spent a month trying to determine whose fault it was and what kind of bacteria was contaminating the products. After two months, Naturich recalled all available units not already sold from the client's warehouses. The client's retailers had already sold a significant number of units which were distributed into hotel bathrooms.  The defective product remained in Naturich's warehouse through Kurilova's termination.

12.    Naturich doesn't have a designated quarantine area for defective product which violates product safety standards.  Kurilova discussed the need for a quarantine designated and clearly marked area to Itzstein and Regulatory Director Kevin Hilbert on multiple occasions. Itzstein told Kurilova that she should have seen how bad the warehouse was before she started but otherwise ignored her complaints.

13.    Upon information and belief, Itzstein instructed the quality control and production teams to keep Kurilova and her team in the dark about any quality or production issues to avoid Kurilova's attempts to enforce best quality and production practices at Naturich.  In order to ensure that her team was on top of potential quality and production issues, Kurilova instructed her team to keep an eye on the rejection box at the end of the production line.  The rejection box was a box where production employees would pull products that had visible contamination or damage from the production line before it could be packed.  Kurilova's team watched the box in order to learn

Plaintiff's First Amended Complaint and Jury Demand –

about potential quality or production issues before the product was packed and shipped since the production team attempted to actively hide such issues from Kurilova's team.

14.     On November 13, 2023, Kurilova reported to quality and production that her team had found four bottles of micellar water with visible brown contamination and that these items had been removed by production and not reported to management or quality.  Kurilova reported, "I brought it to Marina's, Jeremias and Guilermo's attention.  Unfortunately, it seems that no one knew about it, nor did the people above get notified prior to putting the defective product in the reject box."

15.     Kurilova requested that Naturich Microbiologist Kayla Reimer ("Reimer") determine the source of the contamination and requested a random box inspection and if they found more defective items to perform a 100% inspection.  When production dismissed Kurilova's concern, Kurilova escalated the problem to Itzstein and Ammari.

16.     Kurilova requested that Naturich's Quality Control conduct a random inspection of the remaining Whole Foods products in the batch to determine if there were more contaminated products and if more were found upon random inspection to conduct a full inspection.

17.     Itzstein responded to Kurilova copying six other team members:

Every time you demand a 100% inspection we may as well have not even taken the order.  . . I need you to follow the quality process. I can't have you and your team telling production what to do and how to do it. We have a statistical tool for that. Let the process work.  If you feel like your requests aren't being heard from Production, discuss with Suzanne in my absence. This can't happen every time we run WF's (Whole Foods).

18.     Kurilova responded to Itzstein copying Ammar and Naturich's Human Resources Manager Suzanne DeLaney ("DeLaney"):

Mark, I don't appreciate how you treated me in your email to consider the production and QC team was on that email.

While you assert yourself you put my industry experience and knowledge down. I

Plaintiff's First Amended Complaint and Jury Demand –

> believe emails in that kind of tone shouldn't include team members whose responsibilities we are trying to improve.
>
> I would like to set up a meeting with Amer and Prakash to discuss the latest quality issues across several products, not only WF, and hear from Prakash about his defective % number. Please suggest your availability?
>
> Yes, my clients and I feel like no one hears us. Yes, our clients and my managers are suffering through defective product related issues. If we can't make a quality product no matter the brand then we should not accept PO's.
>
> With all -my respect to Suzanne, in what capacity can she help to address any current production or quality related issues on hands?

Naturich never scheduled the requested meeting and never responded to Kurilova's complaints.

19.    The quality control team and Naturich's Whole Foods Brand Manager Bill Gardner ("Gardner") performed the random inspection and found significant contamination, "[a]fter going through the pallets, the first pallet looked good.  The second pallet had a case towards the top. Pallets 3 and 4 all cases had specs."

20.    The production was found to have a 28.6% defective rate.  As such, had Kurilova and her team not found the 4 contaminated bottles in the reject box and pushed for the inspections, over 1,000 contaminated bottles of product would have been shipped.

21.    Kurilova further engaged in the following additional protected conduct:

> Mark, I thought you advised the production and QC team to be more careful & vigilant, visually check the finished goods as it goes through the belt.  I hope you are also addressed to be careful unfolding/folding cardboard boxes near the line. . .
>
> Can I please persuade you not to reuse (with an attempt to clean up) WF micellar used bottles and pumps?  It gets thicker with these types of components, especially pumps, foreign particles most likely have gone up and under the pump's rim and narrow bottle neck.  The cleaning approach is more advisable for jars: wide and open neck, easy accessible to clean.  The safety of the end user is troubling me here beside the visual aspect.

22.    Whole Foods performs annual vendor safety and compliance audits by sending their independent auditor contractor to the vendor's location.  During the January 2024 audit, Kurilova

facilitated lunch for the audit parties involved.  Following the Whole Food's audit, Kurilova attended internal meetings to discuss the results with Purohit, Itzstein, and Director of Regulatory Affairs Kevin Hilbert ("Hilbert").  Hilbert informed them that Whole Foods had flagged approximately twenty-three noncompliant items in the Naturich facilities.

23.     The report results were also discussed on a video call with Purohit, Itzstein, Kurilova, Hilbert, Gardner and several Whole Foods executives. Whole Foods told Naturich during the video call that if Naturich did not take care of all 23 audit findings within a set number of weeks, Whole Foods would exclude Naturich from all current product bidding and terminate the vendor's agreement for existing products.  Upon information and belief, Purohit sought and obtained some exceptions from Whole Foods because some of the requested changes would require Naturich to purchase new equipment and make improvements to their building and Naturich could not afford those changes.

24.     Beginning on March 14, 2024, Kurilova began to question why Naturich failed to meet production dates for Malie's body creams.  Kurilova soon learned that the products were failing microorganism testing.  Naturich's standard procedure is to adjust failed batches by adding raw materials to attempt to salvage batches and pass micro test. Kurilova worried that Naturich's multiple failed attempts to adjust batches in order to pass product testing were unsafe for customers and would further delay production.  She felt it would be best to create a new batch.

25.     When Kurilova discussed her concerns regarding the reuse of the batches with Itzstein he told  her that she should "stay out of it." Itzstein also warned Kurilova that she should not talk to Purohit the owner and then after he was mad.

26.     After Naturich exhausted multiple attempts to adjust a batch to pass testing, they make a new batch. Naturich keeps the failed batches for a later use with the next client order adding older failed batches to a new mix of raw materials. Naturich's product slurries are controlled by a date of compounding. When Naturich mixes an older batch into a later production

run, the client will receive two expiration dates. Kurilova complained to Purohit and Itzstein that Naturich's customers often complained about Naturich products delivered with two different expiration dates which shortens the shelf life of products.

27.     On March 25, Kurilova met with Purohit to discuss her concerns and push for Naturich to use a new batch rather than to continue to try and make the contaminated batch work. Purohit dismissed Kurilova's concerns and refused to allow production of a new batch.   Purohit told Kirillova, "today, tomorrow it will be adjusted. I will tell them (R&D and Compounding Teams) what to change. It failed the first adjustment and made product too thick."

28.     On March 25, Itzstein was irate that Kurilova discussed the contaminated batches with Purohit after he told her not to tell Purohit.

29.     The next day Naturich terminated Kurilova without warning.  Naturich claimed they terminated Kurilova for making discriminatory comments. When Kurilova requested information regarding the alleged discriminatory comments, she was told that Naturich could not disclose the purported statements "to protect the employee" making the unsupported allegations. Notably, although Kurilova was told Naturich conducted an investigation, she was never asked any questions and never given the chance to defend herself.

## V.     CAUSES OF ACTION

### COUNT 1 - Consumer Product Safety Improvement Act

30. Kurilova incorporates paragraphs 6 through 29  as though fully set forth herein.

31.     The CPSIA whistleblower provisions provides for employee protection from retaliation because the employee engaged in protected activity pertaining to consumer product safety.

32.     Kurilova reported product safety issues on numerous occasions, as described above in paragraphs 9-28.  Kurilova asserts that each of these complaints were protected activity under the statute.

Plaintiff's First Amended Complaint and Jury Demand –

33.     Kurilova  reasonably believed the conduct she complained of was in violation of any provision of the CPSA or another Act enforced by the Commission, or any order, rule, regulation, standard, or ban under such Acts.

34.     Kurilova had a subjective belief that the complained of conduct constituted a violation of relevant law.   Such belief was objectively reasonable, for an individual in Kurilova's circumstances with her training and experience.

35.     Defendant was aware of Kurilova's protected activity because she complained to multiple members of the executive team.  By terminating Kurilova, Defendant took an adverse action against her.  This adverse action was because of Kurilova's protected activity and was intentional.

36.     As a result of Defendant's unlawful retaliation, Plaintiff suffered and expects to continue to suffer pecuniary losses, including, but not limited to, lost wages and other benefits associated with her employment.

37.     As a result of Defendant's unlawful retaliation, Plaintiff suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

38.     At all relevant times, Defendant acted with malice and/or reckless indifference to Plaintiff's federally protected rights.  Plaintiff therefore seeks punitive damages.

39.     Defendant's actions referenced in the above paragraphs caused Plaintiff to retain the services of the undersigned counsel in order to pursue her federally protected rights in this action. Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of the suit.

### COUNT 2 - Food Safety Modernization Act

40.     Kurilova incorporates paragraphs 6 through 29  as though fully set forth herein.

41.     The FMSA whistleblower provisions provides for employee protection from retaliation because the employee engaged in protected activity pertaining to food safety.

Plaintiff's First Amended Complaint and Jury Demand –

Additionally, the FMSA provides for employee protection from retaliation because the employee "objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee (or other such person) reasonably believed to be in violation of any provision of this Act, or any order, rule, regulation, standard, or ban under this Act." *See section 1012 of the Federal Food Drug and Cosmetic Act.*

42.     Under the FD&C Act, "the following acts and the causing thereof, are prohibited (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic any food, drug, device, that is adulterated or misbranded. (b) The adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce."

18.     Kurilova reported product safety issues on numerous occasions, as described above in paragraphs 9-28.  On November 1, 2023, Kurilova specifically reported product safety issues relating to the distribution of products containing visible contaminated bacteria growth in four scents of body cream Naturich manufactured for Malie Organics.  Kurilova reported the contamination to multiple members of management, including Purohit, Itzstein and Ammari. Purohit stated at an executive meeting discussing the contamination that the type of bacteria found in the body cream could cause blindness.

43.     A cosmetic that is contaminated with bacteria that could cause blindness meets the definition of adulterated under Section 601 of the FD&C Act; 21 U.S.C. 361.  As such, Kurliova's reports are protected under the retaliation provision of the FMSA.

44.     Additionally, Kurilova asserts that she reasonably believed the conduct she complained of was in violation of any provision of the FMSA or another Act enforced by the Commission, or any order, rule, regulation, standard, or ban under such Acts, including but not limited to the FD&C Act.

Plaintiff's First Amended Complaint and Jury Demand –

45.     Kurilova had a subjective belief that the complained of conduct constituted a violation of relevant law.  Such belief was objectively reasonable, for an individual in Kurilova's circumstances with her training and experience.

46.     Defendant was aware of Kurilova's protected activity because she complained to multiple members of the executive team.  By terminating Kurilova, Defendant took an adverse action against her.  This adverse action was because of Kurilova's protected activity and was intentional.

47.     As a result of Defendant's unlawful retaliation, Plaintiff suffered and expects to continue to suffer pecuniary losses, including, but not limited to, lost wages and other benefits associated with her employment.

48.     As a result of Defendant's unlawful retaliation, Plaintiff suffered non-pecuniary losses including, but not limited to, emotional pain, suffering, inconvenience, personal humiliation, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

49.     At all relevant times, Defendant acted with malice and/or reckless indifference to Plaintiff's federally protected rights.  Plaintiff therefore seeks punitive damages.

50.     Defendant's actions referenced in the above paragraphs caused Plaintiff to retain the services of the undersigned counsel in order to pursue her federally protected rights in this action.  Consequently, Plaintiff seeks attorneys' fees, expert costs, and other costs of the suit.

## VI.  REQUEST FOR RELIEF

51.     Kurilova has no plain or adequate remedy at law to correct the wrongs complained of herein and has thus instituted this suit for damages.   Further, Kurilova is now suffering and will continue to suffer irreparable injury from Defendant's policies, practices, and actions set forth herein.

52.     Kurilova respectfully requests that this Court grant her "all relief necessary to make the [her] whole," including all damages, declaratory relief and injunctive relief provided for under the relevant statutes:

Plaintiff's First Amended Complaint and Jury Demand –

a.  A declaratory judgment, declaring Defendant's past practices herein complained of to be unlawful.

b.  Back pay, front pay, pension benefits, stock options, bonuses, health benefits, and any other relief necessary to compensate Plaintiff.

c.  Punitive and liquidated damages.

d.  Prejudgment and post-judgment interest.

e.  Attorney's fees necessary for prosecution of Plaintiff's claims.

f.  Costs for the prosecution of Plaintiff's claims, including the costs of expert witness  fees; and

g.  Such other general relief to which Plaintiff shows himself justly entitled.

## VII.   JURY DEMAND

51. Plaintiff requests that all ultimate fact issues be submitted to a jury for determination. She has paid the jury fee.

Respectfully Submitted,

_____
Jane Legler
Texas Bar No. 03565820
Kyla Gail Cole
Texas Bar No. 24033113

Cole Legler PLLC
3300 Oak Lawn Ave., # 425
Dallas, Texas 75219
(214) 748-7777
(214) 748-7778 (facsimiles)
jane@nlcemployeelaw.com
kyla@nlcemployeelaw.com

Plaintiff's First Amended Complaint and Jury Demand –